**CASTROL, INC., Plaintiff,**

v.

**PENNZOIL QUAKER STATE CO., Defendant.**

**No. CIV. A. 00–2511.**

United States District Court,
D. New Jersey.

Jan. 4, 2001.

Lewis R. Clayton, John F. Baughman, Jason Pickholz, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY, Anne M. Patterson, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ, for Plaintiff.

James E. Maloney, Ronald Lewis, Sandy Krider, Claire S. Kugler, Baker & Botts, Houston, TX, Michael R. Griffinger, John A. Ridley, Kevin McNulty, Thomas R. Valen, Kristine L. Butler, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for Defendant.

### OPINION

WOLIN, District Judge.

In a prior Opinion ("*Castrol I* "), this Court decided that Pennzoil's current multimedia advertising campaign transgressed the commercial boundaries of fair play. Moreover, the Court determined that the multimedia campaign was repugnant to the regulatory principles embodied in the Lanham Act. Because of the potential for irreparable harm to Castrol and the compelling public interest in protecting competitors and consumers from false advertising claims, a permanent injunction was entered. Other forms of redress sought by Castrol were reserved for later resolution. With further briefing, the time has arrived for the Court to decide those remaining issues, as well as Pennzoil's motion for reconsideration directed to the breadth and scope of the permanent injunction.

At the outset it is appropriate to note that the Court's role as a decision-maker has been reduced by Castrol's decision to abandon its compensatory and punitive damage claims, as well as its claim that Pennzoil violated the New Jersey Consumer Fraud Act. Thus, the Court will direct its focus to the scope of the injunction, Castrol's claim pursuant to the New Jersey common law of unfair competition, and lastly, an evaluation of Pennzoil's conduct as it impacts the disgorgement of Pennzoil's profits and Pennzoil's responsibility to pay Castrol's attorneys' fees.

Because the Court will rely upon its October 12, 2000 Opinion and the evidence adduced in support of that Opinion and the Order attached to it, the Opinion and Order shall be designated as "Exhibit A" to this Opinion. Moreover, that Opinion shall be construed as being in full force and effect, except as it may be modified by this Opinion. As discussed below, the Court's October 12, 2000 Order will be vacated and replaced by the Order entered today.

## I.  THE INJUNCTION

### A.  Background

Pennzoil has filed a Motion for Reconsideration, which seeks, *inter alia,* modification of the Court's Order dated October 12, 2000, in which this Court enjoined certain advertising by Pennzoil.[1] Pennzoil contends that the Court's Order unconstitutionally restrains free speech, is overbroad and vague. *See* Deft.'s Motion for Reconsideration, at 10–14. Castrol, on the other hand, believes that "the Court's October 12 Injunction fairly reflects the evidence the Court heard and is fully consistent with applicable law..." *See* Pltf.'s Ltr. dated November 27, 2000, at 1.

The Court has met numerous times with the parties in an effort to achieve an amicable resolution of these obviously divergent views and to make any necessary modifications to the Court's October 12, 2000 Order. The Court received proposed orders from both parties for the Court's consideration in reviewing and modifying its own. The Court has considered the parties' submissions and will enter a new order today, replacing the prior order which will be vacated.[2]

---

1. Pennzoil filed its Motion for Reconsideration, then also filed a Notice of Appeal with the Third Circuit Court of Appeals, which appeal is stayed pending this Court's determination of the Motion for Reconsideration. *See* Order of the Clerk of the Court of the Third Circuit, October 31, 2000, Court of Appeals No. 00–3614.

2. The parties will no doubt recognize that the Court's new order resembles more closely the proposed order submitted by Castrol than that submitted by Pennzoil. This is because, oddly, Castrol's proposed order better satisfied the First Amendment concerns Pennzoil raised in its Motion for Reconsideration than did Pennzoil's own Order. Pennzoil con-

## B. Analysis

The Court, in considering the parties' submissions and in modifying its prior order, is guided by the Third Circuit's discussion of Lanham Act law in its 1993 opinion in *Castrol I. See Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939 (3d Cir.1993). Many of the same issues were raised in that earlier matter as are raised in the instant action. Again, the Court is asked to determine whether comparative claims made by Pennzoil in its advertising transgressed the bounds of commercial fair play as established by the Lanham Act. Castrol's particular contentions are laid out in detail in the October 2000 opinion and, therefore, do not bear repeating here.[3] The task before the Court, as in *Castrol I*, is to determine whether claims made by Pennzoil were literally or impliedly false, deceptive and misleading, or, if as Pennzoil contended, they were literally true and/or mere puffery.[4]

■ After a full bench trial on the merits in summer 2000, the Court found that the superiority claims contained in Pennzoil's Operation Cobra campaign were not mere puffery.[5] *See* October 2000 Opinion. Puffery has been defined as "an exaggeration or overstatement expressed in broad, vague and commendatory language." *Id.* at 945; *see also Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir.1997) (defining puffing as "exaggerated advertising, blustering and boasting upon which no reasonable buyer would rely"); *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922 (3d Cir.), *cert. denied,* 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990) (defining puffing as advertising that is "not deceptive for no one would rely on its exaggerated claims") (internal quotations omitted). Therefore, if Pennzoil had made merely generalized claims of superiority, they would not be actionable under the Lanham Act. *U.S. Healthcare,* 898 F.2d at 926 (finding that defendant's claims that its health insurance plan was "better than" an HMO were "the most innocuous kind of puffing").

■ Pennzoil went well beyond the general and made specific superiority claims that, in some instances, were linked to

---

tends, in its motion, that the Court's October 12, 2000 Order is unconstitutional "because it proscribes future, truthful commercial speech," yet Pennzoil's proposed order does not answer those concerns. In fact, while their motion stated that "[a]n injunction against running the Brett Favre advertisement, or making advertising claims based on Sequence IIIE engine tests about the relative oxidative thickening characteristics of motor oils, or claiming that Pennzoil's base oil contains fewer contaminants or is more (or less) pure than any of its competitors, would be tailored to remedy the wrongs found by the Court," Pennzoil's proposed order failed to address the specifics its motion addressed. Further, Pennzoil's proposed order said nothing about comparative advertising as to any other motor oil than Castrol's. As Castrol correctly points out in its Supplemental Post-Trial Memorandum, a prohibition with respect to "Castrol motor oil or any other leading motor oil" would "reflect[ ] the proof at

trial—which showed that Pennzoil's claims are false against the entire range of leading motor oils—and the fact that the commercial names and shows each of Pennzoil's leading competitors." Therefore, the Court's Order appended hereto enjoins those claims by Pennzoil that were found literally false with respect to all leading motor oils.

3. That opinion may be found at 2000 WL 1556019 (D.N.J.2000).

4. Pennzoil further asserted a number of affirmative defenses encompassing the legal notions of estoppel, waiver and laches. The Court rejected those defenses in its first opinion.

5. The Court did find that the tag line "Big News," which appeared superimposed on the television screen at the opening of the Brett Favre commercial was puffery and not a false statement. (Finding of Fact 1).

specific attributes of Pennzoil motor oil and, in others, were subject to verification according to accepted industry tests or standards. Such claims cannot be deemed mere puffery. *See United Industries Corp. v. The Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir.1998); *see also The Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 38–39 (1st Cir.2000) (finding that because claim that states "Compare with your detergent . . . . Whiter is not possible" invites consumers to compare, "it is a specific, measurable claim, and hence not puffing."); *Southland Sod Farms*, 108 F.3d at 1145 (finding same as to a claim that turfgrass seed requires "50% less mowing"); *Toro Co. v. Textron, Inc.*, 499 F.Supp. 241, 249–53 & n. 23 (D.Del.1980) (claims concerning specific product attributes are not puffery).

For example, Pennzoil's Brett Favre advertisement falsely conveyed to viewers the impression that Pennzoil motor oil performed better under severe driving conditions and that Pennzoil motor oil was cleaner. Those claims were linked to specific product attributes, and therefore, not puffery. Similarly, Pennzoil's reliance on the double-length Sequence IIIE test to establish its superiority removed the comparative advertising claims from the realm of puffery by suggesting that the claims were subject to verification. Therefore, the claims made by Pennzoil in its Brett Favre ad, its website, and its radio spots that made up the Project Cobra campaign, were not mere puffery.

■ The Court further found that those claims were literally false. *See* October 2000 Opinion. To prove that an advertisement claim based on product testing is literally false, "a plaintiff must do more than show that the tests supporting the challenged claim are unpersuasive." *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir.

1991); *Procter & Gamble Co. v. Chesebrough–Pond's, Inc.*, 747 F.2d 114, 119 (2d Cir.1984). The plaintiff must instead demonstrate that such tests "are not sufficiently reliable to permit one to conclude with reasonable certainty that they established the claim made." *McNeil–P.C.C.*, 938 F.2d at 1549 (internal quotation omitted). A plaintiff may meet this burden either by attacking the validity of the defendant's tests directly or by showing that the defendant's tests are contradicted or unsupported by other scientific tests. *Id.; see also Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62–63 (2d Cir.1992) (hereinafter "*Quaker State*") (distinguishing product superiority claim not based on testing, which must be proven false by affirmative evidence, from product superiority claim explicitly or implicitly based on tests or studies which may be proven false by showing that the tests did not establish the proposition for which they were cited). Moreover, if the plaintiff can show that the tests, even if reliable, do not establish the proposition asserted by the defendant, the plaintiff has met its burden of demonstrating literal falsity. *Quaker State*, 977 F.2d at 63.

This Court found Pennzoil's advertising claims literally false. Indeed, the record was replete with affirmative evidence of the literal falsity of Pennzoil's claims and of the unreliability and inappropriateness of the test relied on by Pennzoil in making its superiority claims. Specifically, the Court found that the double-length Sequence IIIE test was not an industry-recognized test, nor was it correlated to the field; therefore, it could not be relied upon to establish product superiority. The Court also found that, because oil pans are not a rated part of the IIIE test, but rather the VE test, it was literally false to portray them in the advertisement as evidence of Pennzoil's superiority. The

Court further found that the IIIE test is a viscosity test, not a test of performance under stop-and-go or severe driving conditions, nor a test of cleanliness or engine wear. Therefore, Pennzoil's claims regarding its superiority in those categories—to name but a few—were literally false.

## C. Remedy

■ Where an advertisement is found to be literally false, the court may grant injunctive relief without reference to the advertisement's impact on the buying public. *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 649 (3d Cir. 1958) (holding that, to obtain injunctive relief, there is "no requirement that purchasers actually be deceived, but only that the false advertisements have a tendency to deceive.").[6] The Court is permitted to permanently enjoin Pennzoil from making those statements found false at trial. *See Castrol*, 987 F.2d at 949 ("The injunction is ... not overbroad because it only reaches the specific claims that the district court found to be literally false."); *Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F.Supp. 1005, 1024

(S.D.N.Y.1994) ("[T]he defendant shall be enjoined from making, exactly or in substance, those statements that already have been demonstrated to be false....").

Because the law of the Lanham Act prohibits false claims of superiority linked to specific product attributes and because the Court is cognizant of and respectful of Pennzoil's First Amendment rights, the Court's Order appended hereto is focused precisely on the Court's findings at trial.

■ The Court will briefly outline its basis for each provision of the permanent injunction entered here. Pennzoil is enjoined from claiming the following:

- that its motor oil passes a double-length Sequence IIIE test. The Court found that Pennzoil failed the test, (Finding of Fact 14, 25), and even if it had passed it, the double-length Sequence IIIE test is not relevant to the consumer, does not simulate real-world driving conditions, (Finding of Fact 3, 4, 35), and is soon to be replaced by a new test that will employ a modern engine and unleaded gas. (Finding of Fact 30).

**6.** The Court, in fact, found Pennzoil's advertising both literally false and misleading to the consuming public. The advertising was misleading in that, *inter alia*, it suggested to the viewing audience that the Sequence IIIE Engine Test proved that Pennzoil was superior to Castrol and other leading motor oils, when the test does not prove anything of the sort, it does not simulate real-world driving conditions and it is not industry-recognized. Moreover, the public was not informed that the test is run in the laboratory, using an engine unavailable to the ordinary automobile driver with leaded gasoline and that the oil pans were drained and cooled for eight hours before the pictures were taken. Indeed, it was misleading to display the oil pans at all given that the oil pans are not a rated part of the test and the test does not prove cleanliness or purity of motor oil, which was the implied message of the display of oil pans. When an

advertisement is found misleading, as opposed to literally false, in order to find a violation of the Lanham Act, the plaintiff must make a showing of consumer confusion. Here, because the Court found Pennzoil's advertising literally false, such a showing is not necessary. Notwithstanding that, Castrol presented evidence that the Pennzoil campaign did mislead the public and was deceptive. This evidence—in the form of a mall intercept survey—is addressed in the Court's first opinion. *See* 2000 WL 1556019, at *11–*13. The Court found that "[t]he survey's major findings that Pennzoil is a superior product; that tests were used to prove that claim; and that Pennzoil passed the test and/or other competitive motor oils failed, were sufficiently demonstrated to prove that Pennzoil's multimedia advertising campaign was at the very least misleading, confusing and deceiving to the public." (Finding of Fact 59).

- that its motor oil passes any industry standard or specification for the double-length Sequence IIIE test. The Court found that the double-length Sequence IIIE test "is not an industry standard test, nor does it have ASTM standing." (2000 WL 1556019, at *9); *see also* Finding of Fact 28 ("The Ford Specification is not an industry standard test."); Finding of Fact 11 ("The double-length IIIE test does not meet any of the criteria for Industry–Standard Sequence Tests.").

- that its motor oil provides better protection against oxidation, oxidative thickening or oxidative failure than Castrol motor oil or any other leading motor oil. At trial, the Court found "no evidence [that] Pennzoil provides superior protection for anything, let alone the problem depicted in the ad—oxidative failure." (2000 WL 1556019, at * 20).

- that its motor oil provides better protection against viscosity increase, viscosity breakdown or thermal breakdown than Castrol motor oil or any other leading motor oil. In *Castrol I*, this Court held that Pennzoil's claim that its oil "outperforms any leading motor oil against viscosity breakdown" was literally false. Pennzoil was enjoined from making further claims regarding viscosity breakdown, and that provision still remains in force. Therefore the Court may continue such claims. Moreover, in the October 2000 opinion, this Court found that competitive motor oils that are API-licensed and ILSAC-approved (as all motor oil for sale in U.S. markets must be) "provide a margin of safety against engine failure caused by high viscosity increase." (Finding of Fact 20). And, the Court found that "Pennzoil was aware that other conventional motor oils would exceed the viscosity in-

crease parameter if the Sequence IIIE was extended to 128 hours." (Finding of Fact 21).

- that its motor oil provides better performance in stop-and-go driving conditions because the Court found no evidence to support such a claim. To the contrary, this Court found Pennzoil's reliance on the double-length Sequence IIIE test as a means of evaluating performance in stop-and-go driving conditions misplaced, because it is the VE Engine Sequence test that evaluates stop-and-go driving performance. (Finding of Fact 57).

- that its motor oil provides better performance or protection in severe driving conditions or severe service conditions. At trial, Pennzoil's contention that its motor oil performs better in severe conditions was found to be false. The Court specifically found "Pennzoil's reference to 'catastrophic oxidative failure under severe high temperature driving condition' is . . . false and misleading." (Finding of Fact 56). Moreover, the Court noted that Pennzoil's reliance on the double-length Sequence IIIE test as a basis for its contention that its oil performed better in severe conditions was misplaced, given that "the test . . . does not simulate any real world situation, much less 'severe driving conditions.'" (2000 WL 1556019, at *20).

- that its motor oil provides better protection against engine wear. The Court specifically found such a claim to be false. (Finding of Fact 34).

- that its motor oil provides longer engine life or greater engine durability. Again, these claims were part of the injunction in *Castro I*. Therefore, they continue to be prohibited and may be

enjoined here. (*Also see* Finding of Fact 55).

- that its motor oil provides better protection against engine failure than Castrol or any other leading motor oil. In *Castrol I,* the Court found that no tests had been conducted nor evidence presented that demonstrated that Pennzoil motor oils provided better protection against engine failure. In the October 2000 Opinion, the Court found that all motor oil that is API-licensed and ILSAC-approved provides adequate protection against engine failure; Pennzoil did not prove its motor oil to protect better. (Finding of Fact 20, 34).

- that its motor oil is superior based on appearance, color or clarity. As the Court noted in its October 12 Opinion, "[t]he color of an oil has nothing to do with the oil's level of performance and is only relevant from an esthetic [sic] point of view." A base oil is generally clear in color despite its group designation. (Finding of Fact 42, ¶ 3).

- that its motor oil is more pure that Castrol or any other leading motor oil. The Court rejected Pennzoil's purity claims. (Finding of Fact 51). The Court found, with respect to the website, that Pennzoil's "product claim that PureBase is 97% free of contaminants, while other base oils are typically only 80% pure is literally false." (2000 WL 1556019 *20).

- that its motor oil keeps engines cleaner or protects better against sludge or varnish. Pennzoil motor oil is not any cleaner than its competitors. (Finding of Fact 34). The Court found that "[t]he website reference 'Brett Favre tells clean engine story' is both false and misleading to the consumer. Pennzoil motor oil does not keep engines cleaner than its competitors' motor oils." (Finding of Fact 54). The Court also specifically noted that the Sequence VE test, not the Sequence IIIE test, evaluates sludge, varnish formation and valve train wear. (Finding of Fact 18). The Court also found that "[i]t is literally false that [the Sequence IIIE test] rates sludge deposits in oil pans." (2000 WL 1556019, at *19). The Court further concluded that "No consumer driving an actual car in the real world would experience an oil pan sludge deposit similar to the oil pans displayed by the commercial," (*id.* at *20), therefore finding that comparative claims as to sludge or varnish were false.

- that its motor oil provides "protection so strong you can see the difference." The Court specifically found that the slogan was "false and misleading." (Finding of Fact 55).

Linking more explicitly the prohibitions of the injunction to the Court's findings of fact as the Court has done is intended to obviate any contention of overbreadth, vagueness or prior restraint. The injunction in its current form does not violate Pennzoil's First Amendment rights. Commercial speech is protected only in so far as it serves an informational function and it loses its protection if it deceives, misleads or constitutes fraudulent activity. *See generally Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.,* 447 U.S. 557, 563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

■ Because the Court's Order entered today enjoins false commercial speech only, it is not a prior restraint on protected speech. *Castrol,* 987 F.2d at 949 (noting that it is "well settled that false commercial speech is not protected by the First Amendment and may be banned entirely") (citation omitted); *see also Better Business Bureau of Metro. Houston, Inc. v.*

*Medical Directors, Inc.,* 681 F.2d 397, 404 (5th Cir.1982) ("False and misleading representations in advertising are not shielded by the First Amendment; as 'unprotected speech' such statements may be banned entirely"). The Order also permits Pennzoil to make *true* comparative superiority claims in the future without this Court's involvement. The Court has retained jurisdiction over this matter so that, should a legitimate question arise as to the veracity of an advertising claim by Pennzoil, the parties may come here for resolution of the dispute, a process consistent with the Court's experience with the history of the dispute. *See Houbigant, Inc. v. ACB Mercantile, Inc.,* 185 B.R. 680, 686 (S.D.N.Y.1995) (district court would retain jurisdiction over adversary proceeding involving issues of trademark, unfair competition, and Lanham Act, and would not remand to bankruptcy court, because federal district court was familiar with facts of case and already had parties before it several times); *F.T.C. v. Brown & Williamson Tobacco Corp.,* 778 F.2d 35, 44 (D.C.Cir.1985) ("The district court's retention of jurisdiction ... diminishes any danger that the FTC might unreasonably withhold permission for [advertising] which is not deceptive.").

■ The Court's order is likewise not overbroad because it enjoins only those claims this Court found to be literally false. *See Castrol,* 987 F.2d at 949; *see also Brown & Williamson,* 778 F.2d at 43–44 (noting that "any restrictions imposed on deceptive commercial speech can be no broader than reasonably necessary to prevent the deception") (internal quotation and citation omitted). The injunction is specific and it does not suppress more speech than is required to protect the consuming public's interests and those of competitors of Pennzoil. Therefore, it does not run afoul of the First Amendment.

Finally, the Order entered today, which enjoins specific claims by Pennzoil, is not assailable from a vagueness perspective for the same reason that it is not overbroad.

## II. UNFAIR COMPETITION

It is undisputed that the Lanham Act parallels the common law of unfair competition. Because Pennzoil does not contest this claim, it is unnecessary for the Court to detail the factual and legal support that underlie this claim. As cited in Castrol's Memorandum, "the Lanham Act is derived generally and purposefully from the common law tort of unfair competition, and its language parallels the protections afforded by state common law and statutory torts." *American Telephone & Telegraph Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1433 (3d Cir.1994); *American Greetings Corp. v. Dan–Dee Imports, Inc.,* 807 F.2d 1136, 1141 (3d Cir.1986) ("[F]ederal law of unfair competition under § 43(a) is not significantly different from the New Jersey [common] law of unfair competition."); *Birthright v. Birthright, Inc.,* 827 F.Supp. 1114, 1140–41 (D.N.J. 1993) ("It is well established that the test for a common law unfair competition claim under New Jersey law is essentially the same as under the federal Lanham Act.") (Memorandum at 25–26).

Inasmuch as the Court has found Pennzoil liable under the Lanham Act, it follows that Pennzoil is liable under the New Jersey law of unfair competition.

## III. OTHER RELIEF

### A. The Character of Pennzoil's Conduct

Both the disgorgement of Pennzoil's profits and an award of attorneys' fees to Castrol require an evaluation of the character of Pennzoil's conduct in relation to

its multimedia advertising campaign which is currently under the scrutiny of the Court. Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), permits a successful plaintiff, subject to principles of equity, to recover a defendant's profits and in an exceptional case, an award of reasonable attorneys' fees.[7]

In *Castrol I*, the plaintiff did not seek damages or disgorgement of Pennzoil's profits. Moreover, the Court found no culpable conduct that would have supported such claims. Hence, Castrol's application for attorney's fees was denied.

The case currently before the Court presents a different picture. A fair reading of the record before the Court demonstrates an advertising campaign that was both literally false and misleading to the consumer. Pennzoil asserts that its conduct was not willful. Memorandum at 10. It seeks refuge in a non-industry standard test employed by Ford. The Court rejected this argument in the liability phase of the case and similarly rejects it in the evaluation of Pennzoil's culpability at this stage of the case. (Findings of Fact 27, 28, 29). Moreover, Pennzoil's characterization of

Ford's specification as "science" does not convert it into "science," nor minimize Pennzoil's censurability for its intentional and deliberate campaign that was literally false and misleading to the public.

As a counterweight to Pennzoil's lack of willfulness suggestion is a motherlode of factual findings and Pennzoil internal communications that provide direct evidence of Pennzoil's voluntary, knowing, and intentional misconduct. Concededly, some findings of fact are more pertinent than others, but viewed in their entirety, they establish by clear and convincing evidence the essence of willful misconduct.[8] For example, Pennzoil knew that its double-length IIIE Sequence engine test was not relevant to the consumer and did not project the type of real world driving a consumer would experience under normal circumstances. (Findings of Fact 35). The most damning piece of evidence is plaintiff's Exhibit 5030, an e-mail from Jim Newsom to Robert Sutherland dated February 22, 2000. In that communication, Newsom queries, "How is the IIIE relevant to the consumer?" He then opines, "The more tricky question will be to dem-

---

7. Section 1117 states:

    (a) When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 1125(a) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount

    found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

    15 U.S.C. § 1117(a).

8. In order to avail itself of disgorgement of profits and attorney's fees, Castrol has the burden of proving by clear and convincing evidence that such remedies are warranted. *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 555–56 (5th Cir.1998); *Tommy Hilfiger Licensing, Inc. v. Supervalu, Inc.*, 1999 WL 126927, at *2 (E.D.Pa.1999).

onstrate how the 2XIIIE is relevant to the consumer." As the Court has subsequently learned, Pennzoil never did demonstrate how the 2XIIIE is relevant to the consumer. Notwithstanding that failure, it released the Brett Favre commercial that was literally false and misleading to the public.

Exhibit 5030 also demonstrates the frailty of Pennzoil's ability to make a product superiority claim around engine cleanliness. Newsom states, "The most tricky of all. Use the attached chart and **all you[r] guile** to support a product superiority claim around engine cleanliness." [9] (Emphasis added). Pennzoil motor oil, along with all the other motor oils, failed the double-length Sequence IIIE test, yet Pennzoil was willing to substitute guile for integrity to support a false product superiority claim of engine cleanliness. (Finding of Fact 14).

Additionally, in order to support its advertising claims, Pennzoil adopted a secret strategy to delay the GF-3 upgrade of industry testing standards. (Exhibit 5025; Finding of Fact 37). By doing this, Pennzoil not only deceived its customers, but the motor oil industry as well. GF-3's use of unleaded gasoline and a modern engine would have rendered the IIIE test obsolete and caused Pennzoil to jettison the Brett Favre commercial even before its initial airing. Pennzoil deliberately and intentionally delayed its approval of GF-3 in order to promote its false and misleading advertising campaign.

Another internal memorandum from Jim Newsom dated January 12, 2000, Exhibit 5027, counsels as follows: "We will not make any 'tests prove' claims." The same memorandum, in a later passage, continues, "Obtain from Ford (in writing if possible) the significance and relevance of the double length Sequence IIIE requirements in Ford's service fill and world wide specifications." Despite these statements, Pennzoil did make "tests prove" claims and did so without any data from Ford that would inform their decision to rely on the Ford specification. Thus, for Pennzoil to contend that the Brett Favre commercial was based on science prescribed by Ford is both inaccurate and irresponsible, each of which, in and of itself, would demonstrate willful and intentional conduct.

Lastly, the use of a test for comparative purposes that does not meet any of the criteria for Industry–Standard Sequence Engine Tests undermines the probity of Pennzoil's television commercial. (Finding of Fact 11). Moreover, it negatively highlighted Castrol's and other leading motor oil's oil pans with full knowledge that the Sequence IIIE Engine test is primarily a high-viscosity increase test and that oil pans are not a rated part of that test. (Findings of Fact 8, 9). If Pennzoil was concerned with truth and fair play in its commercial advertising, it would have commissioned a series of Sequence VE Engine tests, a test directed to the evaluation of sludge wherein the oil pan is a rated part. (Findings of Fact 18, 19). Because marketing concerns overshadowed technical concerns, the Court is satisfied that the untruthful and unflattering television portrayal of all competitive motor oils was done intentionally and willfully.

## B. Disgorgement of Profits

The Lanham Act, in pertinent part, permits a plaintiff to recover a defendant's profits subject to the principles of **equity**. The text of the statute directs that "the

---

9. The attached chart shows a comparison of competing motor oils on test parameters in a double length sequence IIIE test.

**Court** shall assess such profits ... or cause the same to be assessed under its direction. If the **Court** finds the amount of the recovery based on profits to be either inadequate or excessive the **Court** may in its discretion enter judgment for such sum as the **Court** shall find to be just, according to the circumstances of the case." (Emphasis supplied). Such sum must constitute compensation and not a penalty.

In its complaint, Castrol demands judgment for monetary damages, among other relief. (V. Compl. at 24). Pennzoil enumerates a plurality of reasons why Castrol is not entitled to disgorgement of profits. Initially, Pennzoil contends that the complaint did not make any separate request for disgorgement. Furthermore, Pennzoil asserts that at the merits trial Castrol did not submit any testimony or other evidence that would be directed to the issue of monetary damages. Additionally, Pennzoil relies on Castrol's election not to pursue compensatory damages as a waiver or abandonment of a claim to any type of monetary damages, including disgorgement of profits. (Castrol's November 27, 2000 submission at 3).

Pennzoil makes three other arguments that it avers militate against a disgorgement of profits. The first is a causation argument that would require Castrol to demonstrate with reasonable certainty through an accounting that portion of Pennzoil's profits attributable to the wrongful conduct before it can recover disgorgement. (Citations omitted). Second, Pennzoil argues that because disgorgement is a remedy based on equitable principles, such an award would be inequitable in this case and constitute a penalty. Finally, because Castrol failed to give Pennzoil notice that it was seeking disgorgement, Pennzoil asserts it was deprived of its Seventh Amendment right to a jury trial.

The only argument advanced by Pennzoil that merits any credence is its causation argument. Surely, Castrol must demonstrate with reasonable certainty the portion of Pennzoil's profits attributable to the willful and intentional false advertising before the Court can order disgorgement. Toward this end, the Court shall afford Castrol reasonable discovery into Pennzoil's profits for the relevant time period encompassed by the false advertising. Thereafter, the Court shall hold a trial in the nature of an accounting to determine whether Castrol is able to prove that Pennzoil's increase in profits is causally related to Pennzoil's multimedia advertising campaign.

█ Pennzoil's arguments that the pleading failed to use the term "disgorgement," that no evidence of Pennzoil's profits was introduced at the merits trial, and that Castrol waived or abandoned its right to disgorgement when Castrol advised that it did not seek compensatory damages are faux issues and without substance. Indisputably, the term "monetary damages," pled by Castrol, would include disgorged profits. Furthermore, the Lanham Act unequivocally provides for recovery of a defendant's profits by a prevailing plaintiff, subject to the principles of equity. Of equal importance is the fact that Castrol never represented to Pennzoil or the Court that it would not seek an accounting for disgorgement of profits. An examination of the trial record is devoid of any language of waiver or abandonment of this type of relief. It is hornbook law that "waiver" is an intentional relinquishment or abandonment of a known right or privilege. (Citations omitted). Castrol never abandoned its right to disgorge Pennzoil's profits. Additionally, it was contemplated by the parties and the Court that if Cas-

trol were successful in its Lanham Act claim, additional proceedings before the Court would be necessary. The Court refuses to attribute naivete to Pennzoil's most professional and fully experienced trial counsel. They understood the meaning of the term "monetary damages" as used in Castrol's complaint and were equally aware of the remedies available to Castrol under the Lanham Act.

■■■ Pennzoil's argument that it would be inequitable to disgorge Pennzoil's profits requires less than a passing glance. The Court has already determined that Pennzoil's conduct was intentional and willful. Moreover, through a pattern of deception, it reformulated and tested only one of its products, SAE 5W–30 motor oil, at a time when Pennzoil knew that the test did not pertain to any other Pennzoil products and that its SAE 10W–30 was the best selling grade of conventional motor oil in the United States. (V. Compl. at 25, 44, 61). Accordingly, their profits should be disgorged pursuant to principles of equity, provided Castrol can prove the necessary causative link to the disgorgement of Pennzoil's profits.

■■■ Pennzoil's argument that it was deprived of its Seventh Amendment right to a jury trial is an argument woven out of whole cloth. Indeed, at no case management conference or at the initiation of the merits trial was there any mention of a trial by jury. This argument is not only factually wrong but is also legally erroneous. A plain reading of the Lanham Act remedy section unqualifiedly weighs against Pennzoil's interpretation that they are entitled to a jury trial on the disgorgement of profits issue. The Court has emboldened the language of the statute whenever it mentioned the role of the Court in assessing the recovery of defendant's profits. Furthermore, the language of this

section makes no mention of a trial by jury.

In *American Cyanamid Co. v. Sterling Drug, Inc.*, 649 F.Supp. 784, 788–89 (D.N.J.1986), a respected court of coordinate jurisdiction reviewed the authorities relied upon by Pennzoil and determined that the Lanham Act recognizes claims for profits and claims for damages as being distinct. Moreover, in that case the court concluded that because American Cyanamid abandoned its claim for damages, its remaining claim that sought disgorgement of profits was purely equitable type relief and not subject to trial by jury. In reaching this conclusion, the trial court reviewed many of the authorities relied on by Pennzoil in this action and rejected them because the plaintiff in those actions sought both damages and unlawful profits in the same proceeding. Here, only profits are sought. Profits and damages are categorically distinct. (Citations omitted). Disgorgement of profits focuses on the prevention of unjust enrichment and the deterrence of willful infringement. Compensatory damages, on the other hand, redress an injury. (Citations omitted). As stated in *American Cyanamid*, "claims for both damages and unjust profits cannot be interpreted as blurring the two claims and rendering legal an otherwise purely equitable claim for profits." *Id.* at 789.

## C. Attorneys' Fees

■■■ There is no dispute as to the law that governs the award of attorneys' fees. Both Castrol and Pennzoil agree that "the Court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Legislative history informs that an award of fees is appropriate where the violation could be characterized as "malicious," "fraudulent," "deliberate," or "willful." Senate Rep. No. 93–14300, 93rd Cong.2d Sess. 2 (Dec. 17,

1974) reprinted in 1974 U.S.C.C.A.N. 7132, 7133. Beyond the statute and its legislative history, the Third Circuit has weighed in on the issue in *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.,* 952 F.2d 44, 47 (3d Cir.1991), a case most familiar to this Court. In *Ferrero,* the Court established that the exceptional case for the award of attorneys' fees is one where the Court finds that the losing party engaged in culpable conduct such as bad faith, fraud, malice, or knowing infringement. Courts have awarded attorneys' fees with regularity in Lanham Act cases. (Castrol Mem. Dec. 11, 2000 at 6, n. 1).

Here, the issue is whether Pennzoil's conduct meets the *Ferrero* test of culpable conduct to render this case "exceptional." Pennzoil advances two arguments in opposition to Castrol's claim for attorneys' fees. First, it contends that Castrol waived its claim to fees. Second, it argues that Pennzoil and Castrol are engaged in an honest difference of scientific opinion and that Pennzoil never manifested a specific intent to mislead consumers and attack competing motor oil distributors. Indeed, Pennzoil characterizes its conduct as a good faith effort to run tests according to Ford's specifications and notwithstanding the fact that the Court found this testimony unconvincing and rejected it, it was a worthy effort that does not constitute bad faith.

In response to Pennzoil's waiver argument, Castrol denies that it ever abandoned its right to seek attorneys' fees. It submits that, at no time, not in response to any discovery request nor in any court paper, nor at trial, did Castrol ever state that it would not seek attorney fees. (Mem. Nov. 27, 2000 at 14). The Court is unaware of any pleading or statement of record that would contradict Castrol's reply. Accordingly, the Court declines to find Castrol waived its right to claim attorneys fees.

Pennzoil's second argument, particularly after the Court's finding of facts on liability, strains credulity and seriously undermines the sincerity of Pennzoil's posture before the Court.

In *Castrol I,* the Court gave Pennzoil the benefit of the doubt. Seemingly, the Court's restraint there emboldened Pennzoil to advertise its products beyond the outer limits of their supportable qualities. Although Pennzoil is a repeat offender, what distinguishes *Castrol I* from the circumstances of this case is the manifest intentional and willful conduct that the Court found was absent from *Castrol I.* Here, even Pennzoil's counsel was privy to pre-release strategy sessions and was aware of the restraint that Pennzoil's technical staff attempted, although unsuccessfully, to assert over Pennzoil's marketing division. Yet, no one challenged the literal falsity and deceptive content of the multimedia advertising campaign, and through their silence permitted Pennzoil to brazenly transgress commercial fair play. It is this type of silence that ultimately ripened into a specific intent to engage in a false advertising campaign and to mislead consumers that merits the condemnation of the Court and the remedies provided by the Lanham Act.

This case is an "exceptional" case that permits the Court to award Castrol its attorneys' fees. At the conclusion of the proceeding to disgorge profits, Castrol shall submit to the Court and Pennzoil's counsel its application for fees.

## CONCLUSION

For the reasons set forth above, the Court will deny Pennzoil's motion for reconsideration, modify its injunction, and grant to Castrol its claims under the New Jersey Common Law of Unfair Competi-

tion and the Lanham Act. Castrol is entitled to disgorgement of Pennzoil's profits and to an award of attorneys' fees. An appropriate Order is attached.