**SPALDING SPORTS WORLDWIDE, INC., Plaintiff,**

v.

**WILSON SPORTING GOODS CO., Defendant.**

**CIV.A. No. 02–30031–MAP.**

United States District Court, D. Massachusetts.

May 14, 2002.

Susan G. Fentin, Skoler, Abbott & Presser, Springfield, MA, James E. Daniels, Charles von Simson, Hall, Dickler, Kent, Friedman & Wood, New York City, for plaintiff.

Edward J. McDonough, Jr., Egan, Flanaghan & Cohen, PC, Springfield, MA, for defendant.

*MEMORANDUM REGARDING PLAINTIFF'S MOTIONS FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION*

(Docket Nos. 4 and 15)

PONSOR, District Judge.

## I. *INTRODUCTION*

Plaintiff Spalding Sports Worldwide, Inc. ("Spalding") has brought suit for false advertising under the federal Lanham Act and Massachusetts law against Wilson Sporting Goods Co. ("Wilson"). Spalding contends that Wilson's "True" golf ball ads, which claim that Wilson True golf balls are "perfectly balanced" and disparage the "balance" of Spalding golf balls, necessarily imply a "literally false" claim: that Wilson True golf balls will roll straighter than some Spalding golf balls under actual playing conditions. The present memorandum addresses Spalding's motions for a temporary restraining order and for a preliminary injunction, which demand that the ads be halted or modified. In a one-paragraph order of April 23, 2002, the court denied Spalding's motions. This memorandum will set forth the court's reasoning.

## II. *FACTUAL BACKGROUND*

The issue of "balance" is no small matter in the golf world. As early as 1941, Spalding wrote in a patent application that

> One of the most troublesome problems has been to obtain properly balanced balls. When a golf ball, wherein the center of weight is positioned even slightly away from the geometrical center, is struck, it has a tendency to "hook" or "slice," or to otherwise have its travel adversely affected.

(Docket 19, Exhibit C at 1). "Balance" has been a matter of particular concern in putting. A well-respected golf expert and author of the "Putting Bible," Dave Pelz ("Pelz"), implores golfers to pay attention to the balance of their balls. (Docket 12, Exhibit A). According to Pelz, an unbalanced ball can cause a perfectly hit putt to miss the hole. *Id.* at 204. However, this tendency can be neutralized when a golfer knows how the ball is unbalanced and makes the necessary adjustments. *Id.* at 205.

Pelz suggests that an inexpensive way to determine golf ball balance is for the golfer to place the ball in a solution comprised of luke-warm water, epsom salt, and Jet-dry (a dishwasher despotting agent). *Id.* at 207. In this solution, the ball will float with its "heavy-side" down, and "light-side" up. *Id.* By marking the top of the ball with a permanent marker, a golfer will ensure that she can identify the ball's "heavy side." *Id.*

Pelz explains that if the ball is putted with its "heavy side" even slightly perpendicular to the line to the hole, the imbalance may pull the ball away from the line of the putt. *Id.* at 204–205. The effect of imbalance may be exacerbated or mitigated by at least three factors: (1) the degree of imbalance; (2) the distance of the putt; and (3) the orientation of the ball. *Id.* at 205. Obviously, less imbalanced balls will be affected less. Next, balance matters more in longer putts, because the ball has more time in the roll to be affected by balance. Finally, a ball's alignment is critical. The "worst possible way" a ball could be aligned is "with its off balance axis positioned exactly horizontal and perpendicular to the direction of the roll." *Id.*

Indeed, Pelz contends that the effect of imbalance may be *eliminated* if the ball is aligned so that the imbalance is parallel to the line of the putt by placing the "light side up," rather than to one side. As Pelz demonstrates in his television segment on the "Golf Channel Academy," even a severely unbalanced ball will roll straight when it is placed light side up "because the heavy side [rolls] over the light side and it stay[s] on-line." (Video, Docket 20). Pelz promises the viewer that if his advice is heeded, "your balls will truly roll as they deserve to roll from your putting stroke." *Id.* Thus, golfers should ensure that they mark their balls, and pay attention to the mark when putting. *Id.*

Of course, this advice is most relevant to those golfers who can putt competently to begin with. As Pelz notes, "[i]f you're not a good putter, off-balance balls won't hurt your putting. In fact, they might help by rolling some of your off-line putts back to the hole." (Docket 12, Exhibit A at 205). Thus, poor putters should have no need for permanent markers or epsom salt.

For Pelz adherents, Wilson's advertising may describe a dream come true. Wilson's print advertisement claims that the "Wilson Staff True" is "golf's first perfectly balanced ball." (Docket 4, Exhibit A). The slogan for the "True" balls is: "Putts truer. Flies longer." *Id.* The print ad invites golfers to wonder whether, when their last putt "burned the edge," "it may have been the ball after all." *Id.* According to the ad, unbalanced golf balls have a "heavy side" and a "light side," and therefore "can push any shot to the heavy side, be it a short putt or a long drive." *Id.*

The "True" print advertisement rests its balance claims on the so-called "Wilson test." *Id.* The Wilson test defines the term "unbalanced" as used in the advertisement:

> "Unbalanced" means that randomly selected balls, with their heavy side oriented to the right or left, missed the same 10 foot putt in the Wilson test one-third or more of the times.

*Id.* Wilson invites readers to visit "wilsontrue.com" for more data and information about the test. *Id.*

A Wilson television advertisement, which also touts the "Wilson Staff True" ball, is also at issue here. This advertisement depicts one iteration of the Wilson test for the Spalding and Wilson balls respectively. A man in a lab coat places each ball on what looks like a felt surface, and presses a button. A mechanized putter putts each ball, and the viewer watches

the Spalding ball miss the hole, while the Wilson ball rolls straight. After the Spalding ball misses, the screen flashes a statement: "5 out of every 12 [Spalding] Strata Tour Ultimate II golf balls are unbalanced." (Video, Docket 21). At the bottom of the screen is a definition of "unbalanced," but the viewer who does not press "pause" will see no more than that there *is* a definition; the print is small, and the definition does not linger. *Id.* Then, another message hits the screen: "[t]o see how your ball tested, visit wilsontrue.com." *Id.* In an early version of the commercial, the screen then said: "To file a lawsuit call: 1–866–274–0964." However, Wilson has since revised this message to now read: "How much does balance matter? Decide for yourself." *Id.*

A consumer who visits "wilsontrue.com" finds essentially the same claims being made on the website. By clicking on "ad disclosures," an internet viewer may find the following description of how the Wilson test was carried out, and a summary of Wilson's advertising claims:

*How the Heavy Side of the Golf Ball Is Identified*

Wilson placed each competitive ball in a solution of salt water. In a salt water solution, the light spot on a golf ball will float to the top. Wilson then marked that light spot. The heavy spot is the point on the ball which is opposite from the light spot. Likewise, the heavy side is the side of the ball which is opposite from the light side. After the light spots were marked, the balls were cleaned to remove the salt water solution and to restore the balls to their out-of-box-condition.

*How Wilson Tested the Balls*

After the balls were cleaned, each ball in the test was putt 6 times with the heavy side oriented to the right or left. (This the same as saying that the marked light spot was placed on the right or left side of the ball as the ball was aligned for the test.) Each ball was putt using the same mechanical putter, the same stroke, along the same putting line, to the same regulation-sized golf hole. Each putt was from a distance of 10 feet. The putting surface was firm and smooth to minimize the possibility of a groove developing during the thousands of putts occurring in the test, along the same line.

*Summary of Advertising Claim*

Wilson putt each of 1,800 competitive golf balls 6 times, with the heavy side oriented on the right or left. Wilson considered as "unbalanced," those balls which missed the putt in the test 2 or more times out of the 6 putts.

Wilson considers such an inconsistency to be significant enough to highlight it for consumers, and to offer consumers choice in golf balls where this inconsistency is virtually eliminated—the Wilson Staff True Balanced™ Technology golf balls.

Among the 1,800 competitive golf balls in the test, 27.7% (or 498) of the balls were "unbalanced" (they missed the putt in the test 2 or more times out of the 6 putts). By contrast, only one of the 144 (less than one percent) of the Wilson Staff True Balanced™ Technology golf balls in the test was "unbalanced."

Docket 6, Exhibit A. *See also http:// www.wilsoninsider.com/*WIN/WIN-REG.nsf/truedetails.

There is no dispute about how the test was conducted, or its results. As noted, Wilson used a mechanical arm to make ten-foot putts at a regulation sized golf-hole. The test used seventy-two golf balls of each of the leading brands, and compared the results with seventy-two of the "Wilson Staff True Tour" model and seventy-two of the "Wilson Staff True Dis-

tance" model. Each ball was putted six times, and those balls that failed to drop two or more times were denominated "unbalanced." According to the Wilson advertisement, zero out of twelve of the "Wilson Staff True" balls were "unbalanced," whereas five of twelve of Spalding's balls were "unbalanced." (Docket 6, Exhibit A).

Spalding did not believe that the Wilson test accurately assessed the comparative performance of its Strata Tour Ultimate II golf balls and the Wilson True balls. It hired Boyd Bucher ("Bucher") in the Professional Products Sector at Arthur D. Little, Inc. ("ADL") in Cambridge, Massachusetts to review Wilson's test methodology, and if unsatisfied, to design and execute a fairer test. (Docket 9). Spalding did not ask Bucher to verify the Wilson test results, and does not (now) contest that—given its methodology—Wilson's test was conducted in a reliable manner.

Bucher found two problems with Wilson's test methodology. (Docket 9). First, Bucher noted that the "firm and smooth" putting surface described on Wilson's website was a hard felt surface (akin to a pool table) with an approximate speed of "25" on a "Stimp meter." *Id.* at 3–4. Bucher believed that this choice of surface, quite unlike a typical putting green, was biased against "heavy side" balls. *Id.* at 3.

Second, Bucher objected to the fact that the balls were placed non-randomly, or with the "heavy side" perpendicular to the putting line. Bucher believed that this, too, was biased against "heavy side" balls. *Id.*

Therefore, Bucher devised and executed a test in which the balls were placed randomly and the putting surface simulated the speed of the greens used in PGA tour events. Bucher's green had a Stimp meter reading of 13. Apparently, a typical PGA tour event has green speeds of 10–12 on the Stimp meter. *Id.* at 4.

Bucher used seventy-two Spalding balls, seventy-two Wilson Staff True Tour balls, and seventy-two Wilson Staff True Distance balls. Thirty-six of the seventy-two balls of each brand were putted six times, and thirty-six were putted twelve times. A ball that missed the hole two or more times in six putts was deemed "unbalanced." *Id.*

Bucher obtained different results: thirty-six of the one-hundred-and-eight "Wilson Staff True Tour" balls were unbalanced; sixty-two of the one-hundred-and-eight "Wilson Staff True Distance" balls were unbalanced; and fifty-seven of the one-hundred-and-eight Spalding balls were unbalanced. In Bucher's opinion, this test more accurately measured the relative putting performance of Wilson and Spalding's golf balls and suggested no significant "balancing" difference. *Id.* at 4–5.

Spalding's complaint and motions for injunctive relief rely principally on the Bucher test. However, Spalding also submitted other support for the Bucher position. For example, Jim Furyk, a member of the PGA Tour, testified that he had never seen a golfer place a ball so that the "heavy side" was perpendicular to the putting line, and had never seen a green that was as fast as a pool table. (Docket 7).

Spalding filed its complaint on February 22, 2002. (Docket 1). In Count I, Spalding contends that Wilson's advertisements are "literally false," and therefore violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). In Count II, Spalding claims that Wilson's advertisements constitute false advertising and disparagement in knowing and willful violation of Mass. Gen. Laws ch. 93A. *Id.*

### III. *DISCUSSION*

#### A. *Standard of Review*

The standards governing the issuance of a preliminary injunction in the First Cir-

cuit are well established. An injunction will not be granted unless the moving party establishes that (1) it is likely to succeed on the merits; (2) it faces a significant potential for irreparable harm; (3) the balance of harms weighs in its favor; and (4) the public interest favors issuing the injunction. *See, e.g., EF Cultural Travel BV v. Explorica, Inc.,* 274 F.3d 577, 581 (1st Cir.2001). "Likelihood of success is the touchstone of the preliminary injunction inquiry." *Philip Morris, Inc. v. Harshbarger,* 159 F.3d 670, 674 (1st Cir.1998).

■ Indeed, in the false advertising arena, some courts have concluded that a showing that the challenged statement is likely to be found literally false is sufficient, on its own, to justify issuing the injunction. *Gillette Co. v. Norelco Consumer Prods. Co.,* 946 F.Supp. 115, 120 (D.Mass.1996). *See also Camel Hair and Cashmere Inst. of America, Inc. v. Associated Dry Goods Corp.,* 799 F.2d 6, 15–16 (1st Cir.1986)(holding that "literally false" finding "in itself warranted the grant of the injunction sought."). Of course, if the plaintiff *fails* to show that the statement is likely to be found literally false, that also will end the analysis when no other basis for the injunction is asserted.

## B. *Lanham Act*

■ Section 43(a) of the Lanham Act, pertaining to false advertising, provides:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a).[1] As noted, Spalding seeks to establish a violation of § 43(a) by showing that the Wilson ad is "literally false." This determination requires a two-part factual inquiry. *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.,* 228 F.3d 24, 34 (1st Cir.2000). First, "a factfinder must determine the claim conveyed by the advertisement." *Id.* Second, the factfinder must "evaluate whether that claim is false." *Id.* If Spalding successfully makes this showing, it need not independently prove actual consumer deception. *Cashmere & Camel Hair Manuf. Inst. v. Saks Fifth Ave.,* 284 F.3d 302, 311 (1st Cir.2002)(recognizing presumption of consumer deception when claim was literally false).

### 1. *Claim Conveyed*

■ Spalding's memoranda and injunction requests refer to several of Wilson's statements, including that "5 out of every 12 Strata Tour Ultimate II golf balls are unbalanced;" that an unbalanced ball may "burn the edge" or "betray you when you need it most;" and that the Wilson True ball is "perfectly balanced." However, Spalding does not contend, at least on its present motions for injunctive relief, that these and other phrases, read alone, constitute explicit falsehoods. Instead, Spalding argues that these statements, taken together, convey a literally false ad-

---

**1.** Spalding did not offer any independent arguments or analysis under state law. The court's analysis of its motions for injunctive relief are accordingly confined to the Lanham Act.

vertising claim by "necessary implication." *Clorox,* 228 F.3d at 34–35 (noting that advertising claim conveyed by "necessary implication" may be "literally false" and thereby violate Lanham Act).

■ "A claim is conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Id.* at 35. Spalding contends that Wilson's print and television advertisements convey by necessary implication the following claim: Wilson True golf balls will tend to roll straighter than Spalding golf balls under *actual playing conditions.* (Docket 16 at 2, 4). For ease of reference, this will hereafter be referred to as the "actual playing conditions" claim.

In response to Spalding's motion, Wilson at first attempted to deny that its advertising said *anything* about the effect of balance on actual playing conditions. According to Wilson, its advertisement merely discussed the Wilson test lab results, and said nothing about how an unbalanced ball would perform on an actual green compared to a balanced ball. As noted, "unbalanced" *is* carefully defined by Wilson on the face of the Wilson advertisements as a term of art:

> "Unbalanced" means that randomly selected balls, with their heavy side oriented to the right or left, missed the same 10 foot putt in the Wilson test one-third or more of the times.

(Docket 4, Exhibit A). However, the fact that the advertisements make "balance" a term of art does not mean that the marketing claims surrounding the term imply nothing about how "balance" will affect putting on an actual green.

It is undeniable that the Wilson advertisements necessarily implied that balance will affect, at least some of the time for some golfers, how putts will roll under actual playing conditions. As noted, the "True" slogan is "Putts truer. Flies longer." This advertisement simply makes no sense unless it is understood to suggest that Wilson's "True" ball will perform better under actual playing conditions. Indeed, the ad explicitly suggested that when an unbalanced ball "burned the edge" of the hole, the fault might be in the ball, not the player. In the same way, an "unbalanced" ball, Wilson warned, could "betray you when you need it most." No consumer would view these claims as relating solely to the laboratory.

In short, the court is not persuaded by Wilson's first line of defense, *i.e.,* the untenable argument that the advertisements merely report laboratory results and no more. The necessary implication of the ads is that, because of its improved balance, Wilson's "True" golf balls will tend to role straighter than other balls (including Spalding's) under actual playing conditions. The real question, for purposes of Spalding's motion for preliminary relief, is whether Spalding is likely to be able to show that this necessary implication is literally false.

■ It should be noted that Spalding's job of showing literal falsehood has been made more difficult by the fact that the Wilson advertisements leave the consumer, at least facially, to draw his or her own conclusions about how much the True ball's enhanced balance will actually improve the consumer's own putting game. "The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, however, the less likely it is that a finding of literal falsity will be supported." *United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1181 (8th Cir.1998).

### 2. *Literally False*

The crucial issue, then, is whether the "actual playing conditions" claim will likely

be shown to be literally false under the Lanham Act. The parties agree that because Wilson's advertisement is explicitly based on the Wilson test, it should be treated as an "establishment claim." *See Removatron Intern. Corp. v. F.T.C.*, 884 F.2d 1489, 1492 (1st Cir.1989) ("'Establishment' claims are statements to the effect that scientific tests establish that a product works."); *Gillette Co.*, 946 F.Supp. at 121 ("An establishment claim is one that says, in substance, that 'tests or studies prove' a certain fact."). It is important to note that, in this context, Spalding bears a different burden of proof than if the claim were a "non-establishment claim." *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir.1992). As the Fourth Circuit has explained,

> When an advertising claim of favorable fact either expressly or impliedly asserts that the fact is test or study-validated, the fact of the validation becomes an integral and critical part of the claim. Such a claim may therefore be proven literally false by showing only that the test asserted to validate it did not in fact do so.

*C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P.*, 131 F.3d 430, 435 (4th Cir.1997). Accordingly, to secure injunctive relief, Spalding must show that it is likely to prove that the Wilson test did *not* substantiate the "actual playing conditions" claim. To make this showing, the burden on Spalding is heavy. *See United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir.1998)("the burden on the movant is heavy, in particular where, as here, granting the preliminary injunction will give the movant substantially the relief it would obtain after a trial on the merits.") (internal quotation omitted).

■ A plaintiff may show that a test does not substantiate an advertising claim in at least two ways. First, the plaintiff

may demonstrate that the test is "not sufficiently reliable to permit one to conclude with reasonable certainty that [it] established the claim made." *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir.1991)(quotation omitted). Second, the plaintiff may "show that the tests, even if reliable, do not establish the proposition asserted by the defendant." *Castrol, Inc. v. Pennzoil Quaker State Co.*, 169 F.Supp.2d 332, 336 (D.N.J. 2001).

Spalding takes the latter approach. According to Spalding, the Wilson test cannot substantiate the "actual playing conditions" claim because it has two features that are not typically present out on the course: (1) the non-random alignment placing the heavy side perpendicular to the putting line, and (2) the hard felt surface that is approximately twice as fast as a typical putting green. Spalding argues that the Bucher test corrects for these mistakes, and because it reaches a different result the Wilson test cannot establish its "actual playing conditions" claim.

Spalding contends that two district court decisions support its argument. However, as Wilson correctly points out, both decisions are distinguishable on their facts.

First, in *S.C. Johnson & Son, Inc. v. Clorox Co.*, 930 F.Supp. 753 (E.D.N.Y. 1996), the court found that because the defendant's roach extermination test "eliminate[d] real-world variables," it could not support the defendant-advertiser's specific numerical claim that its product killed "up to 98%" of roaches, and plaintiff's product killed "no more than 60%" of roaches. *Id.* at 783. In this case, even the defendant's experts confirmed that those numbers would not hold true in a typical consumer's home. *Id.* at 768.

Spalding suggests that *S.C. Johnson & Son* supports its argument here because the New York court focused on the distinc-

tion between the product as used in a consumer's home, and the product as tested in the laboratory. It is true that at this level of generality, the New York case appears to support Spalding's argument.

However, a second segment of the holding in *S.C. Johnson & Son* is actually helpful to Wilson. The district judge found that the plaintiff's argument did *not* prevent the defendant from asserting its more general (and most substantial) claim: that the plaintiff's product "only gets rid of some of your roaches," whereas its product "kills just about all of them." *Id.* at 782.

As Wilson notes, the "actual playing conditions" claim only says that Wilson balls will roll straighter than *some* Spalding golf balls under actual playing conditions. *See Castrol, Inc. v. Pennzoil Quaker State Co.*, 169 F.Supp.2d 332, 335 (D.N.J.2001) ("if [defendant] had made merely generalized claims of superiority, they would not be actionable under the Lanham Act."). As noted, a reasonable consumer would not read the advertisements necessarily to imply any specific mathematical comparison about how the balls will roll on an actual green. A reasonable consumer would see that only *some* Spalding balls are unbalanced, and conclude that even an unbalanced ball would affect a typical golfer's putt only *some* of the time. Thus, *S.C. Johnson & Son* has mixed persuasive weight for Spalding.

The second case Spalding offers similarly marginal assistance. In this case, the defendant-advertiser made the unqualified and mathematically precise claim that its deodorizer was "five times better" than baking soda. *Church & Dwight Co. v. S.C. Johnson & Son, Inc.*, 873 F.Supp. 893, 904 (D.N.J.1994). The district court found that claim to be "literally false" because the defendant's lab test, which purported to ground the "five times better" claim, had used only 1/1667 of the amount of cat

urine (25 milliliters) that was involved in a typical "cat incident." *Id.* Indeed, thirty-seven one-pound cans of defendant's product would have been needed to replicate the study for a typical cat incident, which would have "form[ed] a substantial pyramid over 25 milliliters of cat urine." *Id.* After conjuring that nauseous image, the *Church & Dwight* court found that the defendant-advertiser's claims were so divorced from a typical usage as to render the claim "literally false." *Id.* at 904–905.

■ Wilson's claims do not remotely resemble this kind of extreme divorce from actual use conditions. Indeed, for at least two reasons, the Wilson test methodology does, to some extent, support the claim that Wilson balls will roll straighter than some Spalding balls under actual playing conditions.

First, there is little doubt that *some* balls on actual greens will be putted when the "heavy side" is partially (if not completely) perpendicular to the putting path. Balls are usually putted as they lie, and inevitably, some balls will lie so that the heavy side points away from the pin. Similarly, some balls that are temporarily replaced by markers will be set down so that the heavy side is at least somewhat perpendicular to the putting path. Thus, this condition of the Wilson test reflects a reality on the golf course. Only unbalanced balls that land or are put down (by luck or with the Pelz technique) with the heavy side parallel to the putting line are immunized from a tendency to drift.

Second, as even Spalding admits, an artificially fast surface used in Wilson's testing did not *create* the pull a ball would feel towards its heavy side; it only exaggerated that effect. (Docket 16 at 6). The Wilson surface provided less resistance to lateral motion than a slower surface, and therefore allowed a ball to drift more dra-

matically towards its heavy side than if rolling on a slower surface. *Id.* But the test did not create the effect; an exaggerated effect is nevertheless still an "effect." As Pelz notes, a longer putt would have similarly "exaggerated" the effect of an unbalanced ball.

Accordingly, it is unlikely that Spalding will be able to show that the Wilson test does *not* support the "actual playing conditions" claim. It is undisputed that in the Wilson test, only one percent of Wilson True balls missed the putt two or more times out of six putts. Significantly more Spalding balls missed the putt. While this result is certainly exaggerated by the Wilson test, and will be muted on the golf course by a green's speed, random ball placement, and numerous other factors individualized to each golfer's stroke, including the golfer's level of competence, the Wilson test does pick out a factor which will matter in *some* putts.

How much and how often balance will matter, of course, is up for debate. As Pelz notes, it may even be true that some golfers, in some cases, will be helped by a drift towards a ball's heavy side. It also may be, as Spalding suggests, that there are so many variables that affect putting conditions that balance (as defined by Wilson) will rarely matter. But the fact that balance might only rarely matter does not make the "actual playing conditions" claim literally false. At worst, Wilson's claim is literally true but of marginal significance. The fact that "balance" is only one among many factors that affects putting does not mean that Wilson is prohibited by law from isolating the effects of balance on putting in a test, and advertising the results.

It is worth noting, in addition, that the results of Spalding's Bucher test also do not make the "actual playing conditions" claim literally false. *See S.C. Johnson & Son,* 930 F.Supp. at 780 ("a plaintiff cannot meet its burden by merely exposing the methodological weaknesses of defendant's test or by simply alleging that the tests are unpersuasive."). If the Bucher test had shown that the Wilson results were not verifiable, this would be a different case. But the Bucher test incorporated a different methodology.

Thus, the Bucher test shows (at best) only that when a golfer places his or her balls randomly on a normal speed green, he or she will *usually* notice no substantial difference between a Wilson and Spalding ball. This test does not make the "actual playing conditions" claim false.[2] While Spalding's manner of testing may give the results more meaning for a typical player, its data do not undercut Wilson's point that its balls are less likely to go astray when the heavy side is perpendicular to the putting path.

Thus, no injunction will issue. "To ensure vigorous competition and to protect legitimate commercial speech, courts ... should give advertisers a fair amount of leeway, at least in the absence of a clear intent to deceive or substantial consumer confusion." *RPR v. Marion Merrell Dow, Inc.,* 93 F.3d 511, 515 (8th Cir.1996). At this point, no judicial interference in the marketplace is warranted. Of course, Spalding will have an opportunity to prove its case on the merits. This decision should not be read (or advertised) as an endorsement of the Wilson golf ball or the Wilson test. The court has simply found that Spalding has not met its burden at this stage, and therefore is not entitled to

---

**2.** Wilson discounts the Bucher test results. It claims that a groove may have been worn in Bucher's slower, softer surface which may have thrown off its results by increasing the number of putts that dropped.

the extraordinary remedy of preliminary injunctive relief.

## IV. *CONCLUSION*

For the reasons set forth above, Spalding's motions for a temporary restraining order and for a preliminary injunction were DENIED on April 23, 2002. The clerk will set the case for a scheduling conference to establish a chronology for pretrial proceedings.

## *ORDER*

Based upon the plaintiff's failure to demonstrate a likelihood of success on the merits, the plaintiff's Motion for a Temporary Restraining Order (Docket No. 4) and Motion for a Preliminary Injunction (Docket No. 15) are hereby DENIED. A detailed memorandum setting forth the court's reasoning will issue shortly.

It is So Ordered.